IVY HILL PARK APARTMENTS, PLAINTIFF, v. GNB PARKING CORPORATION, DEFENDANT.

Superior Court of New Jersey
Law Division Essex County

Decided February 1, 1989.

---

[3]Unlawful practice is a high risk undertaking. It constitutes disorderly conduct. It would taint any planning board approvals obtained by Yates, thus raising questions as to their enforceability. It also may prevent Craft from enforcing any commission agreement he has with Yates.

*David B. Zolotorofe* for plaintiff (*Goldman, Carlet, Garrison, Bertoni & Klein,* attorneys).

*Robert C. Auriemma,* for defendant.

HONIGFELD, J.S.C.

This opinion amplifies a decision by this court in a summary action between landlord and tenant for recovery of commercial premises due to violation of lease covenants. The case raises the novel question of whether the specificity requirements of *N.J.S.A.* 2A:18–53(c)(4) for the notice to terminate the tenancy and quit the premises may be satisfied if such notice incorporates by reference a sufficiently specific recent notice to cease or cure the violations. This court answers the question affirmatively.

Under the lease in question, Ivy Hill Park Apartments (hereafter "Ivy Hill" or "owner") leased two large parking areas servicing a large apartment complex in Newark, near its border with Maplewood, South Orange and Irvington to GNB Parking (hereafter "GNB" or "tenant"), for a ten-year period commencing January 1, 1985.

The most critical portion of the lease, paragraph 17(1), entitled "Default," provides in pertinent part:

> If Tenant defaults in fulfilling any of the covenants of this lease ... then, ... upon Owner serving a written five (5) days notice upon Tenant specifying the nature of said default and upon the expiration of said five (5) days, if Tenant shall have failed to comply with or remedy such default or if the said default or omission complained of shall be of a nature that the same cannot be completely cured or remedied within such five (5) day period and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written three (3) days notice of cancellation of this lease upon Tenant, and upon expiration of said three (3) days, this lease and the terms thereunder shall end and expire as fully and completely as if the expiration of such three (3) day period were the day herein definitely fixed for the end and expiration of this lease and term thereof and Tenant shall then quit and surrender the demised premises to Owner but Tenant shall remain liable as hereinafter provided.

The lease allows a right of re-entry by Ivy Hill in the event of breach of a lease covenant by GNB and Ivy Hill's compliance with paragraph 17(1). The instrument contains several covenants which were crucial to the ultimate outcome in this case. Paragraph 46 states:

> Tenant shall at its own expense maintain and keep the demised premises in good repair including, without limitation, any repairs to the booths and control arms, ... repairs to the pavement....

Paragraph 54 required tenant to "provide separate attendants for each of the parking booths on a 24 hour per day and 7 day per week basis." Paragraph 58 stated that in the event of damage to booths and arms by fire or other casualty, repairs were to be done by tenant at its expense.

The document, in paragraph 27, entitled "Bills and Notices," permitted service of any notice or communication which the owner might desire or be required to give to tenant by "certified mail" at the "business address" of tenant. Its introductory paragraph designated the principal office of GNB as being "c/o Charles Fine, Esq., 1501 Broadway, New York, N.Y. 10007."

Ivy Hill sent a letter dated May 25, 1988 to Bernard Wittie, president of GNB, entitled "Notice of Violation of Lease Terms—Opportunity to Cure," by both regular and certified mail at the "c/o Charles Fine, Esq." address. There was a return receipt signed by a representative of Fine's office. The letter quoted the aforementioned paragraph 17 of the lease dealing with default of tenant, as well as paragraphs 45 (general obligation of tenant to keep demised premises in good repair), 54 (requiring constant manning of each booth for the lot) and 58 (damages to booths and arms), among other paragraphs. Tenant allegedly violated these provisions. An inspection of the lot was said to have revealed the existence of potholes, an unrepaired guardhouse, and unrepaired electrical arms. Also cited was a failure to constantly man all booths. The letter demanded that these lease violations be cured within five days, or landlord would avail itself of the three-day notice of termination procedure and proceed with any required summary dispossess action.

Another letter, dated June 10, 1988, was sent by Ivy Hill to GNB in the same manner and to the same address as the one

dated May 25 entitled "Notice to Quit, Termination of Tenancy and Demand for Possession." Its significant language read:

> Further to our letter of May 25, 1988 a recent inspection of the parking lots shows that you have ignored our notice of violations of your lease and have failed to cure the defects itemized in that correspondence.
>
> As a result, we have no option but to hereby notify you that you are to quit and peaceably surrender possession of the parking lots, on, or before,
>
> JUNE 30, 1988
>
> at which time your tenancy is hereby terminated.

Bonnie Wittie, daughter of GNB's president and manager of the lots testified that two large potholes, depicted in photographs, were recurring and were only filled in every six months. She admitted that there were times when she arrived at the complex and observed unmanned booths; and that, even now, there is one gate arm down and not functioning. Clearly, GNB violated covenants in the lease, particularly the one requiring it to keep the premises in good repair.

■ The most critical issue in the case is whether Ivy Hill's notice to quit and terminate the tenancy of June 10, 1988 was invalid due to lack of specificity. The answer hinges on whether such notice, if otherwise lacking in specificity, may incorporate by reference a prior notice or other document containing the requisite information.

The applicable statutory section for removal of commercial tenants is *N.J.S.A.* 2A:18–53 (dealing with removal of all but those residential tenants governed by *N.J.S.A.* 2A:18–61.1). This case involves a removal pursuant to section (c) of this statute, permitting eviction:

> Where such person [the tenant] ... (4) shall commit any breach or violation of any of the covenants or agreements in the nature thereof contained in the lease for the premises where a right of re-entry is reserved in the lease for a violation of such covenants or agreements, and shall hold over and continue in possession of the demised premises or any part thereof, after the landlord or his agent for that purpose has caused a written notice of the termination of said tenancy to be served upon said tenant, and a demand that said tenant remove from said premises within 3 days from the service of such notice. The notice shall specify the cause of the termination of the tenancy, and shall be served

either personally upon the tenant or such person in possession by giving him a copy thereof, or by leaving a copy thereof at his usual place of abode with some member of his family above the age of 14 years.

The verb "specify" in the context of this statute was defined by our Supreme Court in *Carteret Properties v. Variety Donuts, Inc.*, 49 *N.J.* 116 (1967):

> The notice is required to "specify" the cause of the termination of the tenancy. "Specify" means to name in a specific or explicit manner; to state precisely or in detail, to point out, to particularize, or to designate by words one thing from another. [citations omitted]
>
> The notice served upon defendant here simply says the tenancy is terminated "for the reason that you have committed a breach of that covenant in your lease providing that the store premises aforesaid are 'to be used and occupied only for the retail sale of food and allied products.'" Such notice does not satisfy the mandate of the statute. It merely states a legal conclusion.... [O]f more crucial significance in appraising the sufficiency of the notice is the failure to specify the nature of the alleged breach. It contains no particularization, no explicit or detailed statement as to the action or conduct of defendant which allegedly constituted such a violation of the use covenant as warranted a demand for a judgment for possession. The shortcoming is especially momentous because, as it later appeared by stipulation in the suit, the sale of bus tickets, whether it was *de minimis* or substantial, had been going on for six years before the notice was served. The sufficiency of the notice as a jurisdictional prerequisite must be judged within its four corners. [at 124–125]

Obviously, the purpose of the specificity requirement in *N.J. S.A.* 2A:18–53(c) is not that of aiding the tenant in changing his conduct, since no notice to cease is required. The obvious reason is to permit the tenant to adequately prepare a defense, since the tenant may contest an alleged breach of a covenant or may raise equitable defenses. Because an action to evict the tenant is normally a summary proceeding devoid of discovery, specification of the cause of termination is a means of adequately advising the tenant of the allegations against which it must defend. The notification given to GNB clearly fulfilled this objective. While the June 10 notice, in and of itself, did not specify how tenant breached lease covenants, it referred to and incorporated the May 25 letter, which detailed both the lease provisions violated and the conduct which breached those covenants.

The first letter notifying GNB of the alleged breaches and giving it an opportunity to remedy them afforded tenant an opportunity which owner was not even required to furnish under *N.J.S.A.* 2A:18–53(c). The combination of the two letters more than amply sets forth for GNB both the conduct and lease provisions in question (thus enabling it to defend any ensuing litigation). The letters were sent only 16 days apart; the earlier letter should have been fresh in the minds of the appropriate individuals of GNB. Indeed, the time sequence between the letters was so close that the second letter should have highlighted and emphasized the first. Elementary logic compels the conclusion that a notice to quit the premises and terminate the tenancy, lacking specificity standing alone, will properly meet the requirement of *N.J.S.A.* 2A:18–53 that it specify the cause of termination of the tenancy if it incorporates or otherwise refers to a recent document furnished to the tenant which does specify the cause.

The breaches of lease covenants found by this court are not minimal, but substantial in nature. The existence of potholes represent an obvious danger to persons and property subjected to them. Failure to constantly man all booths for the lots, to repair broken mechanical gates or arms and to replace a destroyed booth all impaired overall security for both the lots and the apartments they serve by facilitating the presence of unwelcome persons. Breaches which plainly decreased safety factors about the parking area and the apartments cannot be considered minor.

A final issue raised by GNB is the manner of service of the notices. Service by certified mail on "Charles Fine, Esq." concededly is not the sort of personal service required by *N.J.S.A.* 2A:18–53. Nevertheless, service was proper. The lease itself permitted Ivy Hill to send notices and communications to tenant by certified mail at its business address. In the lease, GNB designated "c/o Charles Fine, Esq., 1501 Broadway, New York" as its principal office. Had GNB wished that

notices be sent elsewhere, it could have given a different address than the one contained in the lease.

A lease may provide for a different manner and time period of service than contemplated by *N.J.S.A.* 2A:18–53(c). *Pennsylvania Railroad Co. v. L. Albert & Son, Inc.,* 26 *N.J.Super.* 508 (App.Div.1953) addressed this statutory section:

> To hold that the requirements as to length of notice and the method of service of such notice cannot be altered by agreement of the parties is to read into the statutory provisions language which is not there. Had the Legislature intended that parties to a lease could not vary either the length or method of service of a notice to terminate the tenancy, it could readily and expressly have so provided.... [at 513]

Interestingly, the parking lot lease in question gave more protection to GNB than *N.J.S.A.* 2A:18–53(c) mandated by providing for a five-day notice of termination, as opposed to the statutory three days. It further required the landlord to give GNB a five-day notice of breaches of covenants with an opportunity to correct them, a right not provided by statute. Tenant was even protected if it could not remedy a breach of covenant within the five days, the lease requiring tenant to have "diligently commenced" the cure, and thereafter exert "reasonable diligence" and "good faith" in a continued effort. Moreover, Ivy Hill's notice to terminate was sent 20 days prior to the date of termination, far in excess of the minimum notice period of three days set forth in the lease and the statute. GNB's complaint that the method of service is not in compliance with the statute thus lacks merit.

For the reasons stated, judgment for possession is granted to Ivy Hill.