NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1132-14T3

RED BANK ACQUISITION I, LLC,
d/b/a CHAPIN HILL AT RED
BANK, a New Jersey limited
liability company,

 Plaintiff-Appellant,

v.

R.B. REALTY ASSOCIATES, LP,
a New Jersey limited partnership,

 Defendant/Third-Party
 Plaintiff-Respondent,

v.

LIZER JOZEFOVIC, LORRAINE
JOZEFOVIC, ZEV FARKAS, and
ISAAC FARKAS,

 Third-Party Defendants-
 Appellants.

 Argued April 26, 2017 – Decided July 17, 2017

 Before Judges Alvarez, Accurso, and Manahan.
 On appeal from the Superior Court of New
 Jersey, Chancery Division, Monmouth County,
 Docket No. C-23-12.

 Fred R. Gruen argued the cause for appellants
 (Gruen & Goldstein, and Michael Paneth (Paneth
 & O'Mahony, PLLC), attorneys; Mr. Gruen, on
 the briefs).

 Andrew Bayer argued the cause for respondent
 (GluckWalrath LLP, attorneys; Mr. Bayer, of
 counsel and on the brief; Emily Hinchman, on
 the brief).

PER CURIAM

 Red Bank Acquisition I, LLC, doing business as Chapin Hill

at Red Bank (Chapin Hill), Lizer Jozefovic, Lorraine Jozefovic,

Zev Farkas, and Isaac Farkas, appeal the entry of a judgment of

possession of a nursing home, along with an award of attorney's

fees and costs of $653,454.34. After nineteen days of trial, the

court also held that the parties were bound by an August 21, 2006

lease, and that the agreement did not transfer ownership to the

nursing home beds within the facility. We affirm the court's

judgment, except for counsel fees. On that score, we vacate the

award and remand for consideration in accord with this decision.

 The final October 29, 2014 judgment included the following

provisions: 1) the lease dated August 21, 2006, promoted by R.B.

Realty Associates, LP (R.B. Realty), was the controlling lease

between the parties; 2) Chapin Hill materially breached the lease;

3) the court awarded possession of the nursing home to R.B. Realty;

 2 A-1132-14T3
4) the judgment required Chapin Hill to vacate the premises and

cooperate fully with R.B. Realty to ensure a smooth transition of

nursing home operations; 5) the judgment obligated Chapin Hill to

pay rent in accordance with the lease until it vacated the

premises; 6) R.B. Realty was the sole owner of the nursing home's

180 licensed beds and thus retained ownership of the bed rights

upon termination of the lease; 7) Chapin Hill and the guarantors

on the lease had to pay legal fees and costs of $653,454.34; and

8) the court denied R.B. Realty's claim for liquidated damages.

 Thereafter, on March 12, 2015, on R.B. Realty's motion to

enforce litigants' rights, the court ordered Chapin Hill to provide

R.B. Realty with the information and documentation necessary to

transfer operation of the nursing home. In addition, the court

directed that once the State authorities approved R.B. Realty's

assumption of operation, Chapin Hill was to vacate the premises.

 The judge's decision relied to a great extent on the trial

testimony of Harvey Lichtman. Lichtman was the treasurer of Ganot

Corporation, a real estate holding company, which owned twenty-

six nursing homes throughout the United States. Sisel Klurman was

Ganot's president and chief executive officer in 2005, when the

lease negotiations began. Lichtman, in addition to his role as

Ganot's treasurer, was Klurman's long-time family friend and

confidante.

 3 A-1132-14T3
 The building in question, located in Red Bank, was sold to

R.B. Realty on July 1, 1979 for $1,914,000. On July 24, 1979, the

Department of Health (DOH) approved the certificate of need (CN)

and transfer of ownership of the building from the prior owner,

enabling R.B. Realty to operate the nursing home. R.B. Realty

leased the building to Red Bank Convalescent Center, Inc. (RBCC,

Inc.), which initially operated the nursing home as a 150-bed

long-term care facility, expanded in 1986 to house 180 beds. In

1993, RBCC, Inc.'s stock was purchased by AG Holdings, a Ganot

company, whose treasurer was Lichtman, and whose president and

director was Klurman. RBCC, Inc. then began doing business as

Avante at Red Bank (Avante). The Avante officers in 2005-2006

were Richard Berson, vice-president and acting president, Bill

Ioanno, secretary, and Lichtman, treasurer. Klurman was Avante's

director and chairman of the board.

 Avante's successful nursing home business began to decline

after 2000. Its profit and loss statement for the fiscal year

ending May 31, 2006, showed a loss of $1,791,160.

 Lizer Jozefovic worked for Avante as the Red Bank facility

administrator from 1993 to 1999, and initially held an ownership

interest in Chapin Hill. Zev Farkas was Avante's administrator

from 2004 until September 2006. Farkas owns the majority interest

in Chapin Hill.

 4 A-1132-14T3
 Lichtman testified that in 2005, he began negotiating the

lease agreement between the parties with Jozefovic. It was

Klurman's practice to rely upon Lichtman for advice, and she never

made business calls or conducted meetings on her own. David

Reimer, Esquire1 represented R.B. Realty in the transaction. Mark

Zafrin, Esquire represented Jozefovic and Chapin Hill. Reimer

prepared a draft agreement after Lichtman relayed the terms of the

proposed lease to him.

 Lichtman sent Jozefovic the initial draft, which called for

a ten-year lease term with four five-year options to renew.

Section 9.3 of the draft stated that all licenses and CNs were

vested exclusively in the landlord, and that the tenant had no

rights unless expressly granted in the lease. Because Klurman and

Lichtman had always enjoyed a good relationship with Jozefovic,

the draft required him to remain as the tenant's managing partner.

 On July 20, 2005, Zafrin sent Reimer an email with Jozefovic's

comments. Rather than a ten-year term with options to renew,

Jozefovic asked for a flat thirty-year term. He also sought a

modification of section 9.3 whereby the landlord would retain

rights only to the building, and would convey the CN. Jozefovic

also wanted to reduce the bed size of the facility, and to that

1
 Reimer did not testify at deposition or trial despite the
parties' efforts to subpoena him.

 5 A-1132-14T3
end, wanted the right to temporarily decertify beds for periods

not to exceed two years at a time.

 Lichtman said that he rejected most of Jozefovic's proposals.

He identified a September 15, 2005 memorandum from Reimer to

Zafrin, containing Jozefovic's requests accompanied by Lichtman's

responses. Lichtman denied the request for a thirty-year lease,

but agreed that the four, five-year options to renew would be

automatic. He wrote "*?No" next to Jozefovic's § 9.3 proposal and

wrote "No Lessee is not purchasing the CN" in the September 15

memo. Lichtman likewise wrote "No" next to the request to reduce

the number of beds. At trial, he explained that bed rights are a

valuable asset and he did not want the tenant to do anything to

jeopardize the number of beds on the license.

 After Zafrin informed Reimer that Jozefovic wanted to assign

up to seventy-five percent membership interest in the company to

people who were investors or to family members, Reimer agreed, but

added that a condition of any transfer would be that Jozefovic

remain in voting control. Zafrin accepted that condition, but

asked Lichtman to reconsider the bed decertification issue.

Lichtman reluctantly agreed to decertification under five specific

conditions described in the document.

 On January 3, 2006, Lichtman sent Jozefovic an email with a

new lease draft attached that Reimer had just prepared. Section

 6 A-1132-14T3
9.3 remained unchanged from the June 23, 2005, draft. Reimer

incorporated Lichtman's comments to section 12.4 concerning

percentage of membership, but instead of writing Jozefovic's name

as retaining voting control, he left the space for a name blank.

Lichtman testified that it was understood that the limited

liability company would be manager-controlled and that Jozefovic

would be the manager. The draft had a new section, section 13.3,

that enumerated the steps the tenants had to take before the number

of beds could be reduced.

 At this time the parties were also discussing a second

agreement necessary to consummate the lease initially designated

as an "asset transfer agreement," but later designated as the

"operations transfer agreement (OTA)." According to Lichtman, the

OTA's purpose was to set forth the protocols for addressing

accounts receivable, inventory, supplies, accounts payable,

prepaid credits, employees, fringe benefits, approved payroll and

so on. Although Lichtman was involved in certain aspects of

negotiating the OTA, the primary responsibility for negotiation

fell on Berson.

 On January 4, 2006, Zafrin sent a draft OTA to Reimer,

Jozefovic, and Lichtman. Lichtman forwarded the draft to Berson

and also to Farkas. At that time, Lichtman believed that Farkas

was simply Avante's administrator; he did not know that Farkas was

 7 A-1132-14T3
also part of Chapin Hill's ownership group. He testified that he

did not believe it was a coincidence that once the parties entered

negotiations the nursing home began to experience large losses.

He implied Farkas intentionally brought down the value of the

facility and personally changed the terms of the lease and OTA to

benefit Chapin Hill.

 On February 8, 2006, Reimer sent Lichtman a red-lined version

of the OTA reflecting the changes made by Berson. Paragraph 8(d)

addressed Avante's right to assign licenses and permits, adding

"except to the extent held by the landlord." Lichtman testified

that the language was added to protect the landlord's CN and bed

rights.

 Starting on February 16, 2006, Reimer and Zafrin exchanged

emails concerning changes to the lease agreement and OTA; by

February 21, 2006, Zafrin stated that he was ready to execute the

documents. On February 23, 2006, Reimer responded that his client

was signing the OTA and he would send Zafrin the signature pages

to be followed by the complete agreement. Zafrin replied that his

client had already signed the lease and the OTA, and that he would

fax the signature pages. At that point, Lichtman believed that

both the lease and the OTA were "done deals."

 On February 23, 2006, Berson signed the OTA on behalf of

Avante, and Klurman signed as a witness. Lichtman was present

 8 A-1132-14T3
when the documents were signed. Lichtman sent Reimer a fax of the

signature pages for the OTA and the lease, adding that "some

signatures need to be added" to the lease. Zafrin then sent Reimer

a fax of the signature pages of the lease and OTA, both signed by

Jozefovic.

 The lease draft exchanged on February 23, 2006, while executed

by both parties, left the dates, the term of the lease, and the

amounts of rent due blank. Sections 9.3 and 13.3 were complete,

however, and consistent with the changes that had been negotiated

in January 2006.

 On May 16, 2006, Zafrin applied to DOH to transfer ownership

of the nursing home from Avante to Chapin Hill. In the cover

letter, he stated that the lease had an initial term of ten years

with four additional five-year renewal options. Annexed to the

application was a copy of the lease, consistent with the February

23, 2006 draft, except that the term of the lease was set at ten

years with four, five-year renewal options, and the rent was set

at $509,752. The OTA was also attached. The submission identified

the ownership of Chapin Hill, and included Jozefovic and Farkas.

R.B. Realty was not copied on the application and attachments, and

Lichtman testified that as of May 2006, he was still unaware that

Farkas was an owner of Chapin Hill.

 9 A-1132-14T3
 Zafrin emailed Reimer on July 17, 2006, that DOH could not

read the signature page from the OTA, and needed a fully executed

copy of the lease. In response, Reimer sent Zafrin a fax of

Klurman's signature for the lease. Lichtman stated that Klurman

would have believed the February 23, 2006 lease was the only one

she was signing in July 2006, because they did not know that Zafrin

submitted a different version of the lease to DOH in May. DOH

approved the transfer of ownership on July 20, 2006.

 From the end of July through the end of August 2006, emails

were exchanged in anticipation of closing. With regard to the

lease, the emails addressed the closing statement, security

deposits, amounts to be paid, capital improvements to the building,

and the means of calculating annual rent increases. As to the

OTA, the parties had to agree on the value of the inventory,

approved salaries, union benefits, and disposition of the

facility's automobiles.

 R.B. Realty became concerned when it learned that Jozefovic

was no longer going to be the "key man" in the transaction and

wanted to ensure the monthly rent would be paid. Therefore,

guarantee agreements were negotiated and signed at the end of

 10 A-1132-14T3
August with the principals of Chapin Hill.2 There was no mention

in any of the emails from July or August of bed decertification,

license rights, or CNs.

 Lichtman testified that the deal closed on either August 31,

2006, or on September 1, 2006. Chapin Hill sent R.B. Realty a

check for the amount due at closing on September 1, 2006, and

started operating the nursing home on that date.

 Lichtman identified the hand-dated August 21, 2006 lease as

the final lease between the parties. When Reimer forwarded the

lease to Zafrin on August 22, 2006, Zafrin asked for one additional

change: that a sentence be added to section 22.2 requiring the

landlord, in the event of a default, to make commercially

reasonable efforts to obtain a new tenant so as to mitigate

damages. Lichtman did not agree to the requested change. R.B.

Realty received no other emails from Zafrin between August 21 and

September 1, except for those addressing capital improvements

Chapin Hill was making to the facility and the guarantees.

 The August 21, 2006 lease was consistent with prior lease

drafts. Although section 1.2 was blank as to the lease term,

2
 Appendix VIII contains unsigned, undated guarantee and
indemnification agreements attached to unsigned, undated copies
of the lease. The guarantees purportedly sent to R.B. Realty on
August 31, 2006 are attached to the August 21, 2006 version of the
lease.

 11 A-1132-14T3
section 1.3 specified four periods of five years each for renewal.

Rent was set at $509,752.51 annually with a two percent annual

increase. Sections 9.3 and 13.3 were unchanged from the February

23, 2006 draft.

 Although the signature page contained two signatures from

Klurman, Lichtman testified on direct examination that Klurman did

not sign the August 21, 2006 lease.3 Rather, Klurman's signatures

were copies of earlier signatures that she provided to Reimer,

probably in response to Zafrin's request for signatures in July

2006. Lichtman speculated that Reimer had simply attached those

signatures to the lease.

 On January 25, 2008, Reimer gave Lichtman a final, executed

original copy of the August 21, 2006 lease that had both Klurman's

signature and Jozefovic's signature attached. When Lichtman

received the lease from Reimer, he believed that all the signatures

were proper.

 Matan Ben-Aviv, Klurman's grandson, joined Ganot as chief

executive officer, and began systematic review of relevant leases

of all of the company's facilities. The search for the lease for

3
 On cross-examination, however, Lichtman stated that he did not
remember whether or not he had Klurman sign the August 21, 2006
lease. On redirect, he said that he definitely had Klurman sign
the lease and he gave that signature to Reimer. He did not explain
these inconsistencies.

 12 A-1132-14T3
the Red Bank nursing home led to the discovery in November 2009

that the lease provided by Jozefovic was inconsistent with the

August 21, 2006 lease in R.B. Realty's files. At that juncture,

the discrepancies could not be discussed with Klurman, then

struggling with problems with dementia and heart disease.

 Lichtman testified that the August 31, 2006 lease provided

by Chapin Hill was significantly different from the August 21,

2006 lease. Section 1.2 provided for a fixed thirty-year lease

term instead of the ten-year term with four five-year options.

The August 31, 2006 lease did not contain section 12.4, requiring

Jozefovic to act as Chapin Hill's sole manager. It also deleted

all of section 13, except for two minor provisions, thus allowing

Chapin Hill to make temporary changes to the number of licensed

beds. Furthermore, at the end of section 22.2, a sentence had

been added requiring the landlord, after notice of default, to

make commercially reasonable efforts to obtain a new tenant so as

to mitigate damages. Section 8.3, which prohibited Chapin Hill

from financing equipment or fixtures without the landlord's

permission, was eliminated.

 The August 21, 2006 lease had Klurman's signature on the

signature page, below which Lichtman had written her name and

title. The August 31, 2006 lease only had her signature. Lichtman

testified that although he witnessed Klurman's signature on every

 13 A-1132-14T3
document she signed on behalf of R.B. Realty or Ganot; he did not

see her sign the August 31, 2006 lease. She did not have a

computer in her home or office, and did not know how to operate a

fax machine. Klurman relied upon others, including Lichtman, to

open her mail and organize her papers. She never mentioned any

changes to the August 21, 2006 lease to Lichtman.

 At Ben-Aviv's behest, R.B. Realty's attorneys became involved

in September 2010 and sent Chapin Hill an executed copy of the

August 21, 2006 lease. In October 2010, Chapin Hill responded

that it needed the right to manage its own bed count. Chapin Hill

stated that it had temporarily decertified beds and put them into

a holding company pursuant to DOH regulations.

 By that time, both Lichtman and Ben-Aviv were aware that

Chapin Hill had transferred fifty beds off license. Ben-Aviv

explained that he discovered that information on his own by looking

on a government website that listed the facility as having only

130 beds. Chapin Hill had never notified R.B. Realty of the

transfer, nor did it post a bond as required by section 13.3 of

the August 21, 2006 lease.

 In November or December 2010, R.B. Realty received documents

from DOH pursuant to an OPRA request. The documents revealed that

on September 1, 2006, Chapin Hill sold thirty-five beds to Red

Bank Acquisition I Holding LLC ("the holding company") for ten

 14 A-1132-14T3
dollars each. On January 10, 2007, Chapin Hill wrote to DOH

requesting to change the number of transferred beds from thirty-

five to fifty. That request was approved by DOH on February 23,

2007.

 The first page of the February 23, 2007 letter from DOH

identified the ownership of Chapin Hill; Jozefovic's name was not

on that list. An application for a license filed by Chapin Hill

with DOH on April 11, 2007, which confirmed the fifty-bed transfer,

was signed by Farkas as managing member.

 As a result of the information contained in these documents,

Ben-Aviv authorized his attorneys to send Chapin Hill a notice of

default. On January 12, 2011, counsel sent Chapin Hill a letter

entitled "Notice of Default and Termination of Right to

Possession." Chapin Hill disputed the allegations of this letter,

and R.B. Realty sent a second notice of default and termination

of the lease on February 25, 2011. Unsuccessful settlement

negotiations followed. R.B. Realty sent Chapin Hill additional

notices of continuing default on August 19, 2011, and October 8,

2013.

 During the litigation, Chapin Hill continued to pay, and R.B.

Realty continued to collect, rent on the nursing home property.

Nevertheless, Ben-Aviv stated that as a result of the breach R.B.

Realty suffered liquidated damages of $100,000 per transferred

 15 A-1132-14T3
bed, litigation costs, and losses associated with its inability

to refinance the building while litigation was underway. He also

claimed that Klurman's reputation was besmirched by comments made

by Jozefovic and Farkas.

 Jozefovic's testimony entirely contradicted the negotiations

as described by Lichtman. Jozefovic asserted, for example, that

Klurman signed the August 31 lease after he explained the

impossibility of successfully operating the nursing home without

the ability to exercise greater control over the number of nursing

home beds. He testified he did not sign the August 21, 2006 lease

for that reason. He claimed that because he was dissatisfied with

the August 21, 2006 lease, he had a heart-to-heart last-minute

call with Klurman, during which she agreed to the terms found in

the August 31 lease. He also claimed that after she signed the

lease and faxed her signature back to Farkas, he then reviewed it

and signed it. Jozefovic never received the original of Klurman's

signature attached to the August 31, 2006 lease.

 The judge did not find Jozefovic's testimony credible. Among

other details, Jozefovic testified that he had Farkas make the

changes to the August 21 lease directly, rather than referring it

to the attorneys who had prepared and exchanged earlier documents,

because time was of the essence. Additionally, when he spoke with

 16 A-1132-14T3
Lichtman in late August, he never mentioned the August 31, 2006

lease nor did he tell Berson.

 Moreover, the closing statement indicated the purchase price

for the lease was $300,000. R.B. Realty was credited for rent

advances, security deposits, real estate taxes, inventory,

automobiles and prepaid expenses, and Chapin Hill was credited for

employee benefits. Bed rights or license rights were not

referenced in the closing statement.

 Chapin Hill began construction work almost immediately upon

assuming the operation of the nursing home, replacing the wall

coverings, flooring and ceiling on the first floor of the building;

renovating every room in the subacute unit on the top floor; and

remodeling all common areas. Jozefovic estimated that his

expenditures on capital improvements exceeded $1.5 million.

 Chapin Hill did not dispute that on January 10, 2007 it

submitted an application to DOH to transfer thirty-five beds to

the holding company, which had "substantially similar ownership"

to Chapin Hill. On February 23, 2007, DOH approved Chapin Hill's

request to increase the number of transferred beds to fifty. An

official license DOH issued to Chapin Hill on April 26, 2007,

indicated that the nursing home was now a 130-bed facility.

 Jozefovic explained that decertifying beds, as contemplated

in the earlier drafts of the lease, was risky because DOH might

 17 A-1132-14T3
view the beds to be "disappeared" and not allow them to be put

back on the license in the future. The better practice, which was

formally approved by DOH in 2005, was to transfer the beds to a

separate holding company. If DOH approved the transaction, there

would be no trouble transferring the beds later back to the

operating company.

 Jozefovic also denied having signed the August 21, 2006 lease

which purportedly bore his signature. Although he attempted to

reach out to Klurman to discuss the problem with the leases in

September 2010, once he learned about her health issues, he did

not attempt to contact her again.

 In the January 18, 2011 response Jozefovic sent to R.B. Realty

after receipt of the first letter of default and termination of

possession, Zafrin stated that "the tenant has never asserted

ownership over those beds, in derogation of the landlord's

expressed rights to the beds upon the expiration of the lease nor

does the tenant intend to make such as assertion." Jozefovic

testified that this sentence was "mistakenly written" and that he

reproached Zafrin for writing it. Nevertheless, he admitted that

he never sent anything to R.B. Realty to correct the mistake.

 Indeed, Jozefovic acknowledged that his new counsel, Fred

Gruen, "reiterated the same mistake" in a December 7, 2011 letter

to R.B. Realty: "[y]our client continues to own the reversionary

 18 A-1132-14T3
rights of all licensed beds and that the [fifty] beds as well as

the 130 bed balance will be returned to your client at lease

expiration termination in accordance with its terms." Jozefovic

stated that he always believed that he owned the bed rights and

that his attorneys' letters were written to placate R.B. Realty

for settlement purposes.

 After litigation started, Jozefovic transferred the fifty

beds from his holding company back to Chapin Hill. He did this

as a "peace offering" and because Medicaid had stopped enforcing

the low occupancy penalty, not because he conceded there had been

a breach of the lease. To the contrary, Jozefovic claimed that

R.B. Realty was looking for a loophole in the lease to get him out

of the building. He had finally made the nursing home profitable

and now R.B. Realty wanted to take the business back.

 Zafrin, Jozefovic's counsel in the Chapin Hill transaction,

testified that since he and Reimer were not located in the same

state, communication was by phone, email, or fax. All documents,

including at closing, were exchanged by fax and email, and the

principals exchanged their signature documents directly. Hence

not everyone was copied on everything.

 Zafrin corroborated Jozefovic's testimony that section 13.3

was under discussion until the time of closing, and that any

limitation on the ability to adjust the bed count was unacceptable

 19 A-1132-14T3
to Chapin Hill. He prepared the OTA draft, and believed it granted

Chapin Hill the right to take the beds and licenses with them

after the lease expired. Zafrin understood the purpose of the OTA

to be to convey all assets used in the operation of the nursing

home, as opposed to the real estate. He claimed that the fully

signed February 23, 2006 lease draft was simply a "placekeeper"

necessary to get Chapin Hill's application initiated with DOH.

The parties were under pressure to get the deal finalized on or

before September 1, 2006, so that Avante could avoid filing a

fiscal report for 2005 and incurring a Medicaid low occupancy

penalty.

 Zafrin submitted the unsigned June 2005 draft to DOH, not the

February 23, 2006 document. On cross-examination, he acknowledged

that he did not remember details regarding the DOH application

because it was handled by others in his office. Lawyers were not

involved in the transaction after September 1, 2006, and as a

result he did not become aware of a finalized copy of the lease

until the 2010 dispute regarding its terms. Zafrin acknowledged

writing the January 18, 2011 letter in which he said Chapin Hill

did not assert ownership over the beds, but added that by that

time he had forgotten the terms of the OTA.

 In 2007, Farkas held a fifty-five percent interest in Chapin

Hill. He was not directly involved in the negotiations for the

 20 A-1132-14T3
lease and OTA. Farkas changed the August 21, 2006 lease on

Jozefovic's directions. He filled in the blanks in section 1.2

to reflect a lease term of thirty years, and deleted all of

sections 12.4 and 8.3, and parts of sections 13.1, 13.2, 13.3, and

18.1. Farkas did not recall when he made the changes.

 The attorneys were not available and there was a deadline

coming up so Farkas met with Jozefovic, who signed the modified

lease. Farkas then faxed the lease to Klurman and received a

signature page signed by Klurman by return fax. He attached her

signature to the lease and put it in his filing cabinet. He did

not remember ever sending a copy of the fully signed August 31,

2006, lease to R.B. Realty or to the attorneys involved in the

transaction and noted that the original lease was destroyed by

flooding caused by Hurricane Irene in August 2011.

 With regard to the April 11, 2007 license application to DOH

that he signed as "managing member," Farkas denied that the

designation was his actual title. He said he did not "look at

titles," and that the difference between a member and managing

member was "splitting hairs."

 The parties presented two handwriting experts. The court

credited the testimony of R.B. Realty's expert, J. Wright Leonard,

who testified that Klurman's signature on the August 31, 2006

lease exactly matched her signature on the February 23, 2006 OTA

 21 A-1132-14T3
that was submitted to DOH in May 2006. Leonard opined "that this

questioned signature was lifted, or manipulated from the [OTA]

signature . . . in order to create the signature page in

question." She was not exactly sure how Klurman's signature was

lifted, but noted that there are several ways to do it, the most

current being to cut and paste on a computer using photo software.

 The court did not credit Chapin Hill's expert, William J.

Ries. The judge noted that Leonard compared signatures with the

aid of a microscope, whereas Ries enlarged the previously reduced

signature on a lease to do a side-by-side comparison. He had

difficulty explaining why enlarging a poor quality reduction might

not have distorted the original, thereby significantly

contributing to his opinion that Klurman's signature on the August

31 lease was not a copy.

 The court also heard testimony from experts in nursing home

regulations and DOH process. James Fogg, Chapin Hill's expert,

stated that based on his research, a CN was issued to RBCC, Inc.,

but never issued to R.B. Realty. A change of ownership application

was made in 1993 when the operator changed from RBCC, Inc. to

Avante through a stock exchange. As of 1993, DOH recognized Avante

as the licensed operator of the nursing home and R.B. Realty as

the owner of the physical plant. No transfer of ownership

application is on file with DOH, which would have been necessary

 22 A-1132-14T3
in order for R.B. Realty to acquire license rights from Avante.

Accordingly, it was his opinion that Avante was the only party

recognized by DOH as holding license rights throughout the

operation and history of the facility. Fogg also testified that

the DOH files contained a fully executed copy of the August 31,

2006 lease, submitted in 2007 when Chapin Hill renewed its license.

The file also contained a copy of the February 23, 2006 lease

signed by Jozefovic, and an unsigned May 2006 lease draft.

 Fogg noted that Avante could have leased its license rights

and bed rights to Chapin Hill instead of selling them. Fogg

believed, however, that Avante transferred its license rights to

Chapin Hill by sale as evidenced by the OTA language. Because

Chapin Hill purchased the beds, when the lease term expires it can

choose to move the license to another physical location.

 In Fogg's experience, if the landlord intends to resume

control over the license, and nursing home beds revert to it at

the end of the lease, then the landlord clearly states that

understanding in the recitals portion of the contract. The lease

normally includes a clause requiring the tenant to cooperate in

any such transfer. None of those elements are present in the OTA

executed by Avante and Chapin Hill, and for that reason Fogg

concluded that the parties did not intend for the license rights

 23 A-1132-14T3
to revert back to the landlord. Fogg opined "that Chapin Hill

purchased and now owns the license rights for that facility."

 Chapin Hill transferred fifty beds from its license to a

holding company on February 23, 2007. Those beds were transferred

back to the Chapin Hill license in 2012. Fogg represented Chapin

Hill in both transactions. He testified that he did not provide

R.B. Realty with notice of the bed transfers because section 13.3

was not in the lease that he had been given.

 Based on the evidence produced at trial, the court found that

"the lease promoted by [R.B. Realty], D-19 in evidence marked

8/21/06 is the true lease. The testimony of [] Jozefovic, []

Farkas and [] Zafrin was not credible or persuasive." It rejected

Jozefovic's testimony that he resolved all issues in his favor

during a single phone call to Klurman, observing that his version

of events was "totally unworthy [of] belief[,]" and further

observed:

 [] Zafrin would have the Court believe after
 over one and a half years of negotiations with
 attorneys and principals, he ceded the
 finalization of the transaction to the parties
 themselves, and never followed up on it.

 Furthermore, the testimony that []
 Jozefovic finalized the terms of the lease
 with [] Klurman is controverted by the
 testimony that [she] was 80 years old, in
 failing health, and never conducted any
 business without her right hand man, Mr.
 Lichtman. [] Lichtman testified that he knew

 24 A-1132-14T3
 nothing of the heart to heart between []
 Jozefovic and [] Klurman.

 The court noted that Chapin Hill violated the terms of the

August 21, 2006 lease beginning the day after closing when it sold

thirty-five beds to its holding company. Chapin Hill further

violated the lease when it named Farkas rather than Jozefovic as

a "principal." The court continued:

 It is obvious that Chapin Hill had no
 intention of complying with the lease. The
 request by R.B. Realty in 2009, for a copy of
 the executed lease was fortuitous. It gave
 Chapin Hill the opportunity to provide its own
 version of a lease on terms entirely favorable
 to it. The Court finds that [] Klurman's
 signature was lifted from one document onto
 the August 31, 2006 Chapin Hill version by
 someone acting on behalf of Chapin Hill.

 As to bed rights, the judge found that both parties understood

that the reference to licenses and permits in section 9.3 of the

lease encompassed that term. The judge refused to consider any

expert opinions with regard to whether Chapin Hill purchased the

bed rights, finding that it constituted impermissible testimony

concerning the interpretation of a contract. The judge also found

that section 9.3 of the lease clearly reserved the bed rights to

the landlord, and that while section 2 of the OTA stated that the

buyer was purchasing all "licenses and permits" held by the seller,

that reference did not include bed rights in light of sections

 25 A-1132-14T3
13.3 and 9.3 of the lease. Furthermore, Chapin Hill did not assert

ownership of the bed rights until after the litigation commenced:

 The assertion by [Chapin Hill] that it owns
 the bed rights is disingenuous. Further,
 Chapin Hill retransferred the beds back [to]
 its license in February 2012. It would not
 have done that it if owned the bed rights.
 The Court finds that R.B. Realty did not sell
 the bed rights to Chapin Hill either through
 the lease or the [OTA]. The Court finds that
 R.B. Realty owns and has always owned the bed
 rights.

 The judge further found that the notices of default were

proper and that Chapin Hill defaulted under the terms of the lease

by transferring beds to a holding company, failing to give timely

notice of the transfer, failing to provide R.B. Realty with all

communications with DOH, failing to pay the $100,000 transfer fee,

and substituting the managing member of Chapin Hill.4 These

defaults were material, thus the court entered judgment for

possession in favor of R.B. Realty.

 The court denied R.B. Realty's request for $5 million in

liquidated damages. The court concluded that since both the beds

and the premises would be returned, a more appropriate remedy

would be to award counsel fees to R.B. Realty.

4
 The judge said by "substituting [] Jozefovic as the managing
member of Chapin Hill," but given the decision and context, no
doubt the judge intended to say either "substituting [] Farkas"
or "substituting for [] Jozefovic."

 26 A-1132-14T3
 On appeal, Chapin Hill raises the following points for our

consideration:

 I. STANDARD OF REVIEW.

 II. THE TRIAL COURT CONCLUSION THAT THE
 NOTICE OF DEFAULT/TERMINATION OF JANUARY
 11, 2012 COMPLIES WITH THE LEASE §19 AND
 WAS SUFFICIENT TO TERMINATE THE LEASE AND
 PLAINTIFF'S RIGHT TO POSSESSION IS
 CONTRARY TO CONTROLLING CASE LAW; IT WAS
 A MISTAKE OF LAW.

 III. THE TRIAL COURT'S TERMINATION OF
 PLAINTIFF'S LEASEHOLD RIGHTS IN THE
 CONTEXT OF EQUITY'S ABHORRENCE OF A
 FORFEITURE (CONFUSION OVER WHICH LEASE
 DRAFT IF ANY WAS THE "TRUE LEASE", THE
 RE-TRANSFER OF PAPER BEDS TO PLAINTIFF
 AND ABSENCE OF INJURY TO DEFENDANT, AND
 PLAINTIFF'S HAVING SPENT $1.5 MILLION TO
 IMPROVE THE DEMISED BUILDING AND HAVING
 CREATED A PROFITABLE BUSINESS)
 CONSTITUTED AN ABUSE OF DISCRETION.

 IV. THE TRIAL COURT'S HOLDING THAT THE AUGUST
 21, 2006 LEASE DRAFT IS THE "TRUE LEASE"
 IS UNSUPPORTED BY ADEQUATE, SUBSTANTIAL,
 CREDIBLE EVIDENCE IN THE RECORD, AND IS
 A MISTAKE OF LAW (STATUTE OF FRAUDS).

 V. THE TRIAL COURT'S HOLDING THAT THE AUGUST
 31, 2006 LEASE WHICH CONTAINED NO BED
 TRANSFER RESTRICTIONS DOES NOT REFLECT
 AGREEMENT OF THE PARTIES AND WAS NOT
 SIGNED BY SISEL KLURMAN FOR LANDLORD, IS
 UNSUPPORTED BY ADEQUATE, SUBSTANTIAL,
 CREDIBLE EVIDENCE IN THE RECORD.
 ALTERNATIVELY, THE HOLDINGS WERE BASED
 UPON AN EVALUATION OF THE FACTS AS
 TESTIFIED TO BY PLAINTIFF'S WITNESSES, AS
 UNPERSUASIVE AND INCREDIBLE, AND NOT UPON
 AN EVALUATION OF THE CREDIBILITY OF THE
 WITNESSES. AS SUCH, PLAINTIFF IS

 27 A-1132-14T3
 ENTITLED TO A DE NOVO REVIEW OF THAT
 EVALUATION, AND SO REVIEWED, THE AUGUST
 31, 2006 LEASE SHOULD BE ADJUDGED THE
 TRUE LEASE BETWEEN THE PARTIES.

 VI. THE TRIAL COURT'S HOLDING THAT THE
 LANGUAGE OF THE LEASE §9.3 AFFIRMED
 DEFENDANT'S OWNERSHIP OF LICENSE
 RIGHTS/BED RIGHTS AND THAT THE OPERATIONS
 TRANSFER AGREEMENT DID NOT CONVEY THE
 SAME TO PLAINTIFF IS A QUESTION OF LAW
 ENTITLED TO DE NOVO REVIEW, AND AS SO
 REVIEWED MUST BE REVERSED.

 VII. THE AWARD OF ATTORNEYS' FEES IS
 UNDERMINED BY THE VERY CERTIFICATION OF
 SERVICES OF DEFENDANT'S ATTORNEY UPON
 WHICH IT IS BASED.

 I.

 In an appeal from a bench trial, "[t]he scope of appellate

review of a trial court's fact-finding function is limited."

Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)

(quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)). The factual

findings and legal conclusions of the trial judge are not disturbed

unless the reviewing court is "convinced that they are so

manifestly unsupported by or inconsistent with the competent,

relevant and reasonably credible evidence as to offend the

interests of justice." In re Trust Created by Agreement Dated

Dec. 20, 1961, ex rel Johnson, 194 N.J. 276, 284 (2008) (quoting

Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474,

484 (1974)). "Deference is especially appropriate when the

 28 A-1132-14T3
evidence is largely testimonial and involves questions of

credibility. Because a trial court hears the case, sees and

observes the witnesses, and hears them testify, it has a better

perspective than a reviewing court in evaluating the veracity of

witnesses." Cesare, supra, 154 N.J. at 412 (internal quotation

marks and citations omitted); accord Zaman v. Felton, 219 N.J.

199, 215-16 (2014); N.J. Div. of Youth & Family Servs. v. E.P.,

196 N.J. 88, 104 (2008).

 An appellate court owes no deference, however, to a trial

court's interpretation of the law and the legal consequences that

flow from established facts. Gallenthin Realty Dev., Inc. v.

Borough of Paulsboro, 191 N.J. 344, 358 (2007); Manalapan Realty,

L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). In

particular, a trial court's interpretation of a lease or contract

is a question of law entitled to de novo review. Kieffer v. Best

Buy, 205 N.J. 213, 222 (2011); Spring Creek Holding Co. v.

Shinnihon U.S.A. Co., 399 N.J. Super. 158, 190 (App. Div.), certif.

denied, 196 N.J. 85 (2008). The appellate court "pay[s] no special

deference to the trial court's interpretation and look[s] at the

contract with fresh eyes." Kieffer, supra, 205 N.J. at 223.

 In our view, the trial court's decision was grounded in

factual determinations made significantly based on credibility

determinations, in addition to the correct application of relevant

 29 A-1132-14T3
law. The numerous rulings were substantially supported by the

record, and are entitled to deference on appellate review.

 II.

 Chapin Hill contends that the trial court erred by concluding

the landlord's notice of default complied with the terms of the

lease, was legally sufficient, or afforded it a cure period. We

disagree.

 Chapin Hill actually received three notices regarding its

failure to comply with the terms of the August 21, 2006 lease. In

both the August 21 and August 31 leases, section 19.1 required

R.B. Realty to extend to Chapin Hill a seven-day cure period before

it could declare an event of default. The January 12, 2011 notice

of default sent on Ben-Aviv's authorization, was titled "notice

of default and termination of right to possession[.]" Chapin Hill

disputed the allegations of this letter on January 18, 2011, and

R.B. Realty therefore sent a second notice of default and

termination of lease on February 25, 2011. When unsuccessful

settlement negotiations ensued, R.B. Realty sent Chapin Hill

additional notices of continuing default on August 19, 2011, and

October 8, 2013. In the interim, Chapin Hill continued to pay

rent on the nursing home property.

 With regard to notice, the court stated:

 30 A-1132-14T3
 Chapin Hill further contends that R.B. Realty
 did not send a proper notice of default and
 did not allow Chapin Hill to cure the alleged
 default within the seven[-] day period. This
 is a convoluted reading of Section 19.2. . .
 . The Court finds that the notices of default
 were proper and that Chapin Hill has defaulted
 under the terms of the lease . . . .

 Where the terms of a contract are clear and unambiguous, they

must be enforced as written. Twp. of White v. Castle Ridge Dev.

Corp., 419 N.J. Super. 68, 74-75 (App. Div. 2011); Kampf v.

Franklin Life Ins. Co., 33 N.J. 36, 43 (1960). The court may not

make "a better contract for the parties than they themselves have

seen fit to enter into, or alter it for the benefit of one party

and to the detriment of the other." Karl's Sales & Serv., Inc.

v. Gimbel Bros., 249 N.J. Super. 487, 493 (App. Div.), certif.

denied, 127 N.J. 548 (1991).

 When faced with differing proposed interpretations of

contractual terms, however, the court must determine whether the

language of the agreement is indeed clear and unambiguous. Schor

v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002).

 An ambiguity in a contract exists if the terms
 of the contract are susceptible to at least two
 reasonable alternative interpretations. To
 determine the meaning of the terms of an
 agreement by the objective manifestations of
 the parties' intent, the terms of the contract
 must be given their plain and ordinary meaning.

 31 A-1132-14T3
 [Ibid. (quoting Kaufman v. Provident Life &
 Cas. Ins. Co., 828 F. Supp. 275, 283 (D.N.J.
 1992), aff'd, 993 F.2d 877 (3d Cir. 1993).]

The determination of whether ambiguity exists, just as other

interpretations of the terms of a contract, is a question of law.

Celanese Ltd. v. Essex Cty. Improvement Auth., 404 N.J. Super.

514, 528 (App. Div. 2009).

 Here, although the parties interpret the requirements imposed

by sections 19.1 and 19.25 differently, the wording is not

ambiguous. Under section 19.1, an "event of default" occurs when

the lessee fails to fulfill any of the covenants of the lease and

the lessee has not cured, or commenced curing such default, within

seven days after receiving written notice. Section 19.1 further

provides that the "Lessor, at its option, may give to Lessee a

notice of intention to Terminate this Lease, effective as of the

date of the occurrence of an Event of Default." (emphasis added).

Section 19.2, upon which Chapin Hill heavily relies, simply gives

the lessor a right of re-entry, i.e., to take possession of the

demised premises after the lease is terminated in accord with

section 19.1.

 The January 12, 2011 default letter specified that Chapin

Hill's right to possession was being terminated because it

5
 The relevant portions of sections 19.1 and 19.2 are identical in
the August 21, 2006 lease and the August 31, 2006 lease.

 32 A-1132-14T3
submitted an altered and unapproved version of the lease agreement

to DOH; Chapin Hill transferred facility beds to a holding company

without R.B. Realty's consent; and Chapin Hill failed to pay the

December 2010 rent in a timely fashion. It concluded:

 R.B. Realty is hereby placing [Chapin Hill]
 on notice that it is terminating [Chapin
 Hill's] right to possession of the Premises.
 Please contact me so that we may discuss how
 you intend to vacate the Premises in an
 orderly fashion by no later than March 31,
 2011 so that the residents of the nursing home
 are properly protected.

 The January 12 letter conforms to the requirements of sections

19.1 and 19.2. It identifies the relevant violations of covenants

in the lease, informs Chapin Hill that R.B. Realty intended to

take possession, and specifies a termination date more than seven

days after the date of the notice. Although it did not state that

Chapin Hill had the right to cure within seven days, nothing in

either the August 21 or August 31 sections 19.1 or 19.2 required

such language.

 Additionally, R.B. Realty did not take possession until after

two additional notices of default, dated February 25, 2011, and

August 19, 2011. Obviously, Chapin Hill had ample time in which

to correct the alleged defaults.

 Furthermore, N.J.S.A. 2A:18-53(c)(4), which governs

commercial leases, authorizes the removal of a tenant where a

 33 A-1132-14T3
breach of the covenants in the lease is committed, reserving a

right of reentry in the landlord so long as a written notice has

been served, and a written demand made for removal. The notices

complied with the statute. The notices are not required to include

language to the effect that the tenant must cease the objectionable

conduct. Ivy Hill Park Apartments v. G&B Parking Corp., 236 N.J.

Super. 565, 570 (Law Div.), aff'd, 237 N.J. Super. 1 (App. Div.

1989). Thus, the notices of default complied with the law.

 Chapin Hill's reliance on Ingannamorte v. Kings Super

Markets, Inc., 55 N.J. 223 (1970), is inapposite. Ingannamorte

does not support Chapin Hill's argument because the issue in

dispute between these parties is not a technical deficiency

regarding the right to cure. Id. at 226. That was the issue in

Ingannamorte, while here the notices were clear that R.B. Realty

was willing to allow the tenant to continue in the premises.

Chapin Hill, however, does not even recognize the August 21, 2006

lease as valid, or acknowledge that a breach occurred.

 Porter & Ripa Associates, Inc. v. 200 Madison Avenue Real

Estate Group, 159 N.J. Super. 317, 320 (Ch. Div. 1978), aff'd, 167

N.J. Super. 48 (App. Div. 1979), upon which Chapin Hill also

relies, is a case in which a landlord locked out a tenant. R.B.

Realty did not engage in such conduct, and in fact served Chapin

 34 A-1132-14T3
Hill with three notices over eleven months. Accordingly, the

holding in Porter & Ripa has no bearing on the issues at hand.

 Chapin Hill's arguments regarding the notices of default stem

from its disagreement that the August 21 lease controlled, not

from any actual deficiencies in the notices. Since the August 21,

2006 lease controls, Chapin Hill's reduction in the number of beds

through transfer, rather than by temporary decertification, was a

breach. It kept those beds off license for more than ninety days,

failing to give R.B. Realty written notice of the transfer, failing

to give R.B. Realty copies of communications with DOH concerning

the transfer, and failing to provide R.B. Realty with an

irrevocable letter of credit to secure the liquidated damages.

Chapin Hill's transfer of the beds back onto its license did not

cure the breach. As Ben-Aviv testified, R.B. Realty was entitled

to damages for the violation of the lease terms caused by the

unauthorized transfer. Thus, the court did not err in finding

that Chapin Hill's failure to pay R.B. Realty $100,000 per

transferred bed constituted a default of the lease.

 We conclude that the January 12, 2011 notice was sufficient.

The court's findings of default based on Chapin Hill's transfer

of the beds should be affirmed.

 35 A-1132-14T3
 III.

 We agree with the trial court's conclusion that the August

21, 2006 lease was the controlling agreement entered into by the

parties. It ultimately rejected the testimony of Jozefovic and

Farkas as not credible and for that reason found that the August

21, 2006, lease represented the true agreement between the parties.

Its evaluation of witness credibility is entitled to substantial

deference, Cesare, supra, 154 N.J. at 412, and its findings

concerning the August 21, 2006 lease will be affirmed if supported

by competent, relevant, and credible evidence in the record, Rova

Farms Resort, supra, 65 N.J. at 484.

 Lichtman, upon whose testimony the judge relied, testified

that the negotiations were essentially complete when the February

23, 2006 draft of the lease was distributed. Significantly, it

is undisputed that both parties signed the February 23, 2006,

draft. The August 21, 2006, lease was identical to the February

23, 2006 draft, except that the blanks for the amount of rent and

the annual rent increase, which are not in dispute, had been filled

in. The lease term renewal periods had also been filled in, but

the initial lease term had not. Given that Jozefovic signed the

February 23, 2006 draft and that the court disbelieved his

unsupported testimony that Klurman capitulated on several key

provisions during a single, last-minute phone call, it follows

 36 A-1132-14T3
that the August 21, 2006 lease reflected the true agreement between

the parties. The decision was reached based on credibility

findings, and is further supported by other evidence in the record.

 While it is accurate that the court did not address Chapin

Hill's argument concerning Jozefovic's signature on the August 21,

2006 lease, this does not detract from the court's finding of the

lease's authenticity. The signatures on every document produced

after February 23, 2006, were problematic. Even Lichtman was

unsure whether Klurman had actually signed the August 21, 2006

lease. The parties' practice of simply faxing signature pages to

their out-of-state attorneys, who then attached the pages to

documents as required, contributed to the uncertainty.

 The signature pages attached to the August 21, 2006 lease may

well have been duplicates of other signature pages produced at

other times during the negotiations. When considered in the

context of the course of dealings between the parties, utilization

of that practice does not mean that the attorneys were not

authorized to attach those papers. It is undisputed that at no

time during these negotiations did the parties and their attorneys

assemble at the same time in the same place to sign a fully

completed document.

 The court was called upon to determine which agreement

controlled when Chapin Hill took possession of the premises on

 37 A-1132-14T3
September 1, 2006. Its conclusion that that agreement was the

August 21, 2006 lease is strongly supported by the evidence and

should be affirmed.

 Chapin Hill's argument that the court's credibility calls and

other factual findings are conclusions of law to which we should

give plenary review lacks merit. The judge, given the

circumstances of the transaction between these parties, carefully

drew the sequence of events from those witnesses whom she found

worthy of belief, and then only if corroborated by other

circumstances. Therefore, contrary to Chapin Hill's argument, her

conclusions were not conclusions of law which we review de novo,

but rather, conclusions of fact based on credibility

determinations which we review deferentially.

 The court's decision to credit R.B. Realty's handwriting

expert, and not Chapin Hill's, was a reasonable exercise of

discretion. See Torres v. Schripps, Inc., 342 N.J. Super. 419,

430 (App. Div. 2001) (internal citations omitted) ("[E]xpert

testimony need not be given greater weight than other evidence nor

more weight than it would otherwise deserve in light of common

sense and experience. The factfinder may accept some of the

expert's testimony and reject the rest."). R.B. Realty's expert

examined the signatures on the August 31, 2006 lease and the OTA

with the aid of a microscope, as opposed to Chapin Hill's expert,

 38 A-1132-14T3
who enlarged a previously reduced signature for a side-by-side

comparison. Of the two procedures, only one did not potentially

distort the item viewed. Accordingly, we find the trial judge's

decision that the August 21, 2006 lease controlled was reasonable,

based on credibility determinations and other substantial support

in the record.

 IV.

 Chapin Hill further contends that even if the August 21, 2006

lease is the true lease, the court should not have terminated the

leasehold. In support of the argument, it points out that

forfeitures are disfavored in law, and the equities of the case

mitigate against forfeiture, including the company's timely

payments throughout the tenancy.

 "Foreclosure is a harsh remedy and equity abhors a

forfeiture." Brinkley v. W. World, Inc., 275 N.J. Super. 605, 610

(Ch. Div. 1994), aff'd, 292 N.J. Super. 134 (App. Div. 1996). For

that reason, "[a] court of equity may invoke its inherent equitable

powers to . . . deny the remedy of foreclosure." Ibid.

Nevertheless, termination of the leasehold can be an appropriate

remedy when a tenant violates the express terms of its lease

contract. N.J.S.A. 2A:18-53.

 In Dunkin' Donuts of America v. Middletown Donut Corp., 100

N.J. 166, 186 (1985), the Court held that the Chancery Division

 39 A-1132-14T3
had erred by invoking its equitable powers to preserve the rights

of a franchisee that had willfully breached its contract agreement

with the franchisor. The Court wrote:

 We focus first on the contention that
 strict adherence to contractual remedies in
 the circumstances before us will impose a
 forfeiture on the franchisee. Although it is
 true that equity abhors a forfeiture, equity's
 jurisdiction in relieving against a forfeiture
 is to be exercised with caution lest it be
 extended to the point of ignoring legal
 rights. Thus if parties choose to contract
 for a forfeiture, a court of equity will not
 interfere with that contract term in the
 absence of fraud, accident, surprise, or
 improper practice. Although the Chancery
 Division did find fraud, to be sure, the
 fraudulent misconduct was committed by the
 franchisee, who benefitted from the court's
 invocation of equity. The only sound
 conclusion to draw is that equitable relief
 against forfeitures should not be granted to
 a party whose own knowing fraudulent conduct
 is itself the cause of the forfeiture. See
 Faustin v. Lewis, 85 N.J. 507, 511 (1981),
 repeating the equitable principle that a court
 should not grant relief to one who is a
 wrongdoer with respect to the subject matter
 in suit.

 [Id. at 182-83 (emphasis in original)
 (citations omitted).]

 This reasoning applies to the matter at hand. R.B. Realty

did not engage in misconduct, Chapin Hill did by decertifying beds

contrary to the lease agreement. It breached the clear terms of

the lease the day after the transaction closed by transferring

thirty beds off license. It failed to maintain Jozefovic as the

 40 A-1132-14T3
facility's manager despite covenanting to do so. There was also

evidence that Chapin Hill may have used Farkas's position of trust

with Avante to its own advantage during contract negotiations.

Because Chapin Hill's own knowing conduct laid the groundwork for

the forfeiture, the court did not err by refusing to use its

equitable powers to grant it relief.

 None of the cases cited by Chapin Hill suggest otherwise.

For example, Mandia v. Applegate, 310 N.J. Super. 435 (App. Div.

1998), is distinguishable in several ways. In Mandia, the trial

court refused to declare a forfeiture of a leasehold interest

where the tenant, a Seaside Park merchant, had continued using the

boardwalk outside its store to display merchandise despite

warnings from the landlord that the use violated the lease. Id.

at 447-49. We noted that the relevant lease provision followed

the warning that the tenant's breach of "any of its obligations

hereunder" would trigger a forfeiture, suggesting that the breach

of that provision would not result in a default. Id. at 448.

Even if the forfeiture clause applied to obstruction of the

boardwalk, the tenant's display of merchandise, when viewed in

light of the prior business and personal relationship between the

parties, constituted only a minor breach. Id. at 449. Citing to

49 American Jurisprudence 2d Landlord and Tenant § 339 (1995), we

observed that equity may be invoked to avoid a forfeiture of a

 41 A-1132-14T3
lease when clearly necessary to prevent an unduly oppressive result

or to prevent an unconscionable advantage to the lessor. Mandia,

supra, 310 N.J. Super. at 449.

 Here, the language of section 13.3 is not ambiguous. Section

13.3(c) states that "a breach of this provision in any way will

constitute a material breach of the Lease." Thus, the parties

clearly contemplated that a violation of section 13.3 would

constitute a default under the lease. The default was classified

as material and not the minor, non-permissible use that was at

issue in Mandia. Moreover, imposing a forfeiture here is not

oppressive or unconscionable where it resulted from Chapin Hill's

own knowing misconduct. For these reasons, the court did not

abuse its discretion in failing to invoke an equitable remedy to

preserve Chapin Hill's leasehold.

 V.

 We do not address Chapin Hill's statute of frauds argument.

It was not raised below, and is therefore not properly before us.

See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

Additionally, such a claim is an affirmative defense that must be

timely raised in a responsive pleading. Lahue v. Pio Costa, 263

N.J. Super. 575, 597-98 (App. Div.), certif. denied, 134 N.J. 477

(1993). That was not done in this case.

 42 A-1132-14T3
 VI.

 Chapin Hill further contends that the court erred in finding

that the OTA did not convey the bed rights. It argues the evidence

overwhelmingly established that the certificate of need referenced

in section 9.3 of the August 21, 2006 lease pertained to the

building, not the operating licenses, the OTA unambiguously

conveyed the bed rights to Chapin Hill, Chapin Hill paid over $2

million in consideration for those bed rights, R.B. Realty never

owned the bed rights for the nursing home operation, and Jozefovic

offered a reasonable explanation for the retransfer of fifty beds

from the holding company to Chapin Hill. We do not agree.

 First, it is clear from the drafts of leases presented during

the trial that Chapin Hill's efforts to purchase the bed rights

were unequivocally rejected in the early stages of negotiations.

Lichtman wrote "no" next to such a request on a copy of a July 20,

2005 email from Zafrin.

 Negotiations surrounding the OTA established that the name

of the document was altered for the very reason that no assets

were being conveyed. Additionally, language stating that the

licenses being sold related to ownership of the operations was

removed from section 2(iii).

 Nowhere in any version of the lease exchanged between the

parties were the improvements made to the physical plant, which

 43 A-1132-14T3
Chapin Hill alleges were worth $1.5 million, mentioned as an

obligation on the purchaser, or a portion of the purchase price.

There is simply no evidence that the renovations were other than

a business decision Chapin Hill made unrelated to purchase of bed

rights.

 Chapin Hill's expert's testimony regarding the bed rights,

and references in the OTA as being about the bed rights,

interpreted the contract. The court was obligated to disregard

those opinions concerning the meaning of the contract. Boddy v.

Cigna Prop. & Cas. Cos., 334 N.J. Super. 649, 659 (App. Div. 2000)

(citing Healy v. Fairleigh Dickinson Univ., 287 N.J. Super. 407,

413 (App. Div.), certif. denied, 145 N.J. 372, cert. denied, 519

U.S. 1007, 117 S. Ct. 510, 136 L. Ed. 2d 399 (1996)). The

interpretation of that document is also subject to de novo review

on appeal. See Kieffer, supra, 205 N.J. at 222.

 As an aside, the expert also testified, based on his review

of DOH historical documents, that ownership of the bed rights

still appeared to be in Avante, and was never conveyed by that

entity. Avante, the corporate entity, no longer exists. We were

advised at oral argument that since judgment was entered, the bed

rights were conveyed, with DOH approval, by R.B. Realty to an

outside group which now operates the nursing home. Regardless of

whether DOH was aware of the title problem, or the expert simply

 44 A-1132-14T3
overlooked records establishing a transfer, or that such records

were simply missing, the nursing home is currently fully

operational and the issue is essentially moot.

 In addition to the lack of consideration supporting the

transfer of ownership of the beds, there were other circumstances

that supported R.B. Realty's ownership. Among them we number

Chapin Hill's attorneys writing to R.B. Realty stating that their

client was not asserting ownership over the beds. Although he was

no doubt aware of the contents of those letters, Jozefovic never

made any effort to correct those statements. The issue regarding

ownership and licensing rights did not even arise until after the

second amended complaint was filed in November 2012, almost a full

year after R.B. Realty filed eviction proceedings against Chapin

Hill.

 Finally, the language of section 9.3 of the August 21, 2006

lease is dispositive. It provides that all licenses issued by any

government entity that were related to the premises were vested

exclusively in the lessor, and that the lessee would have no right

or interest in any of the licenses, except as expressly provided

in the lease. At the same time, section 2(iii) of the OTA states

that the seller would convey to buyer "to the extent assignable,

all licenses and permits held by Seller relating to the operations

of the Assets." In section 8(D), the seller warrants that

 45 A-1132-14T3
"[e]xcept to the extent held by the Landlord, Seller holds and has

the right to assign (to the extent the same are assignable) to

Buyer . . . all licenses . . . required to be held by Seller . . .

to conduct and operate the Nursing Home." Thus, the lease vests

all licenses in the landlord and the OTA exempts licenses held by

the landlord from those being sold.

 VII.

 Chapin Hill disputes the trial court's $653,454.34 counsel

fee award for several reasons. First, it attacks R.B. Realty's

certification regarding services in that it does not allocate

entries to the dismissed liquidated damages claim, has duplicative

entries, and entries related to other cases. R.B. Realty responds

that section 15.2 of the August 21, 2006 lease requires the tenant

to pay legal fees for recovery of the facility, the trial judge

had the discretion to award an equitable remedy, and did so in

this case by requiring Chapin Hill to pay legal fees in lieu of

liquidated damages. R.B. Realty also asserts no vague or

duplicative entries were submitted, and that Chapin Hill fails to

specifically identify any such entries.

 Section 15.2 of the lease requires the lessee to pay "all

reasonable legal costs and charges, including counsel fees,

incurred by Lessor in obtaining possession of the demised premises

after Lessee's default." Initially, the court was not relying on

 46 A-1132-14T3
that clause, rather, was awarding counsel fees as an equitable

remedy in lieu of liquidated damages. Subsequently, however, the

court stated that it would award fees based not as an equitable

remedy in lieu of liquidated damages, but on section 15.2 of the

lease.

 The judge did review the counsel fee certification, finding

it complied with Rule 4:42-9(b) and RPC 1:5(a), deleting certain

entries made for work she did not consider strictly relevant to

the litigation. The court noted that this case involved

substantial motion practice, pretrial discovery, travel, and a

nineteen-day trial.

 The difficulty we have with the counsel fee award is that the

language in section 15.2 does not include the dispute regarding

ownership of the nursing home beds. Section 15.2 includes the

work necessary regarding possession of the premises, not

reacquiring the bed rights. Those items should therefore be

deleted, to the extent possible, from the certification as not

encompassed by section 15.2.

 Although the court found the certification complied with

applicable rules, it did not specifically find that the attorneys'

fees were reasonable. No lodestar was established. See Furst v.

Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004) (citing Rendine v.

Pantzer, 141 N.J. 292, 335 (1995)). "[T]he court should evaluate

 47 A-1132-14T3
the rate of the prevailing attorney in comparison to rates 'for

similar services by lawyers of reasonably comparable skill,

experience, and reputation.'" Id. at 22 (quoting Rendine, supra,

141 N.J. at 337); see also Litton Indus., Inc. v. IMO Indus.,

Inc., 200 N.J. 372, 387 (2009) (applying the test for reasonable

attorney's fees in a contract case). Additionally, the hourly

rate should be calculated according to the prevailing market rates

in the relevant community. Rendine, supra, 141 N.J. at 337 (citing

Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)); see

also R.M. v. Supreme Court of N.J., 190 N.J. 1, 10 (2007) (noting

that market rate analysis incorporates equitable considerations).

That process did not occur.

 Accordingly, we vacate the award of attorneys' fees and remand

the matter so that fees and charges related to the bed rights

claim can be deleted, and the court can address the reasonableness

of R.B. Realty's hourly rate and time expended to secure possession

of the premises.

 VIII.

 Finally, Chapin Hill contends the court erred in entering the

March 12, 2015 enforcement order requiring it to cooperate with

R.B. Realty in turning over the business and related documents.

Chapin Hill's objection includes Medicare and Medicaid

 48 A-1132-14T3
certifications, which it avers did not in any way relate to license

transfers or the smooth transition of operations.

 R.B. Realty responds in a footnote in its merits brief that

the enforcement order is within the trial court's equitable

discretion and that, in any event, the court was merely "fleshing

out" the final judgment order. Further, it states that Chapin

Hill failed to address its logistical arguments in a timely fashion

with the court below.

 The March 12, 2015 order directs Chapin Hill to "provide all

information R.B. Realty requests in order to assume operations of

the Chapin Hill nursing home" and to "execute all documents

requested by R.B. Realty to assume operations of the nursing home

including but not limited to all documents related to the transfer

of Chapin Hill's Medicare and Medicaid Certifications." 6 No oral

or written statement explaining the court's reasoning are included

in the record.

 Nonetheless, because Chapin Hill's arguments are vague and

unsupported by facts in evidence, they warrant little

consideration on appeal. See Weiss v. Cedar Park Cemetery, 240

6
 The order also requires Chapin Hill to vacate the nursing home
upon notice that R.B. Realty has been approved by DOH to provide
services to nursing home residents. It also required Chapin Hill
to pay $4663.22 in counsel fees; Chapin Hill does not challenge
that aspect of the order.

 49 A-1132-14T3
N.J. Super. 86, 102 (App. Div. 1990) (failure to adequately brief

issue requires it to be dismissed as waived); D'Ercole v. Mayor &

Council of Norwood, 198 N.J. Super. 531, 542 (App. Div. 1984).

Other than Chapin Hill's bald assertion that the documents

requested by R.B. Realty relate to business valuation and not the

transfer of operations, there is nothing in the record to identify

the materials or how Chapin Hill will be damaged if it provides

them. The trial court, thoroughly familiar with the matter

following weeks of trial, was in a better position than this court

to evaluate the propriety of R.B. Realty's requests. Moreover,

an overriding consideration in the court's calculus likely was the

continuation of care for the nursing home residents. The court's

order, which requires cooperation between the parties, furthers

that end.

 Concerning the Medicare and Medicaid certifications, there

is no basis to consider Chapin Hill's arguments now. Although

Chapin Hill provides a certification from Fogg, it is not clear

whether that certification was timely submitted to the court or

whether the court even considered it. Since the damages Chapin

Hill claims will ensue from sharing the certifications are

monetary, Chapin Hill can file an action at a later date requesting

reimbursement for any receivables that were improperly collected

by R.B. Realty.

 50 A-1132-14T3
 A trial court retains the discretionary power to make

equitable determinations to achieve a just result. McNair v.

McNair, 332 N.J. Super. 195, 198 (App. Div. 2000). Nothing in the

record suggests that the trial court abused that discretion by

ordering Chapin Hill to cooperate with R.B. Realty in the transfer

of the nursing home operations.

 Affirmed in part; reversed and remanded as to the award of

counsel fees. We do not retain jurisdiction.

 51 A-1132-14T3